UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
VERA MULLER-PAISNER, as executrix,           :

                     Plaintiff,           :           03 Civ. 6265 (GWG)

    -v.-           :           <u>OPINION AND ORDER</u>

TIAA, et al.,           :

                Defendant.           :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Vera Muller-Paisner brings this action in her capacity as executrix of the estate of the late Dr. Mary Engel against TIAA; TIAA-CREF Enterprises, Inc.; Teachers Insurance and Annuity Association; and College Retirement Equities Fund (collectively "TIAA" or "defendants") alleging the following claims: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; and (4) rescission.  Muller-Paisner and TIAA have each moved for summary judgment.

For the reasons discussed below, the Court has concluded that its prior order granting plaintiff summary judgment on the question of whether TIAA owed the decedent a fiduciary duty, <u>see</u> Order, filed Sept. 27, 2011 (Docket # 103) ("Sept. 27 Order"), was incorrectly decided and that the Court should have ruled that a jury would decide the question of whether TIAA owed Dr. Engel a fiduciary duty.  Nonetheless, the Court concludes that even if a fiduciary duty existed, the defendants would be entitled to summary judgment on the ground that they did not breach any fiduciary duty.  Because this conclusion disposes of all claims against the defendants, the case is dismissed in its entirety.

I.     BACKGROUND

The following facts are undisputed, unless otherwise stated.

A.     Facts Regarding the Purchase of the Annuity

For approximately 30 years, Dr. Mary Engel was employed as a psychology professor at various universities, including the University of Michigan, Harvard University, and the City University of New York.  See Defendants' Answers and Objections to Plaintiff's First Requests to Admit, dated Jan. 14, 2010 (annexed as Ex. G to Declaration of Max Wild in Support of Motion for Summary Judgment, filed Dec. 20 and 30, 2010 (Docket ## 78, 82) ("Wild Decl.")) ("1st R. Admit") at 8 ¶ 20.  Dr. Engel was a beneficiary of the "retirement and/or pension plans of the colleges and universities that employed her."  Id. at 8 ¶ 21.  These retirement plans were administered by the defendants.  Id. at 8 ¶ 22.

Dr. Engel "suffered from emphysema, one of a group of repertory conditions included within the phrase 'chronic congestive pulmonary disorders.'"  Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed Jan. 4, 2011 (Docket # 85) ("Pl. 56.1 Statement") ¶ 12; Defendants' Counter Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed Apr. 7, 2011 (Docket # 93) ("Def. Counter 56.1 Statement") ¶ 12.  Decedent's emphysema "adversely impacted her breathing, speaking and imposed physical limitations, such as walking or traveling."  Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment – Dr. Harlan Weinberg, filed Dec. 20 and 30, 2010 (Docket ## 77, 83) ¶ 3 ("1st Weinberg Decl.").  Plaintiff's expert, Dr. Weinberg, states that this disease, commonly referred to as COPD, "shortens" a person's life expectancy.  Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment – Dr. Harlan Weinberg, filed Feb. 28, 2012 (Docket # 120) ("2d Weinberg Decl.") ¶ 5, though he also

2

testified that it was not possible to make an accurate prediction about mortality because "[a] lot of people with COPD outlive the numbers," Deposition of Dr. Harlan Weinberg, dated July 20, 2010 (annexed as Ex. B to Declaration of Jonathan R. Harwood, filed Apr. 29, 2011 (Docket # 99) ("1st Harwood Decl.")) at 68.  Dr. Engel's physical complaints were the reason that she decided to retire.  Deposition of Vera Muller-Paisner, dated June 15, 2010 (annexed as Ex. C to 1st Harwood Decl.) ("Muller-Paisner Dep.") at 19–20, 31.

Muller-Paisner, a friend of Dr. Engel's, states that Dr. Engel was "cognitively impaired in financial matters," a conclusion that appears to be based on Dr. Engel's incurring of unnecessary late-payment charges on her credit card and on her appearing unable to understand financing options relating to housing.  Plaintiff's Supplemental Declaration in Support of Renewed Motion for Summary Judgment, filed Feb. 28, 2012 (Docket # 121) ¶¶ 6-8; see also 2d Weinberg Decl. ¶ 6 ("Ms. Engel was cognitively impaired at least as to financial matters.").  But there is no other evidence of instances in which Dr. Engel displayed cognitive impairments in her interactions with other people.  Muller-Paisner testified that Dr. Engel had never exhibited behavior that indicated she was confused.  Muller-Paisner Dep. at 115.

In late 1999, Dr. Engel wrote defendants various letters posing questions regarding her retirement benefits.  See Letter from Mary Engel to Melvin Roldan, dated Oct. 1, 1999 (annexed as Ex. D to 1st Harwood Decl.) ("Oct. 1, 1999 Letter"); Letter from Mary Engel to Melvin Roldan, dated Nov. 14, 1999 (annexed as Ex. E to 1st Harwood Decl.) ("Nov. 14, 1999 Letter"). In response to these inquiries, defendants contacted Dr. Engel by telephone and provided her with answers to the questions contained in her letters.  See Record of Conversation Between Robert Rom and Mary Engel, dated Oct. 8, 1999 (annexed as Ex. D to 1st Harwood Decl.); Record of Conversation Between Angela Lang and Mary Engel, dated Nov. 11, 1999 (annexed

as Ex. D to 1st Harwood Decl.); Record of Conversation Between Robert Rom and Dr. Engel, dated Dec. 1, 1999 (annexed as Ex. E to Harwood Support Decl.).  None of the inquiries related to annuities.

From October 1999 to January 2001, Dr. Engel spoke to approximately 18 different "counselors" who were employed by defendants in their "call center."  Pl. 56.1 Statement ¶ 20; Def. 56.1 Counter Statement ¶ 20.  "Defendants' call centers were organized so that any of their counselors who [were] available would answer calls of participants."  Pl. 56.1 Statement ¶ 16; Def. 56.1 Counter Statement ¶ 16.  While Dr. Engel's conversations with the counselors were not memorialized verbatim, each counselor was "required to prepare [a] call sheet either during the actual call or immediately thereafter;" the call sheets provided "a summary of the discussion with a participant during a given telephone call."  Affidavit of Robert Ahearn, filed Apr. 7, 2011 (Docket # 92) ("Ahearn Aff.").[1]

The first mention of an annuity in the record dates from a telephone conversation on August 21, 2000, when Dr. Engel spoke with TIAA counselor Jason Zervakos.  Record of Conversation Between Jason Zervakos and Mary Engel, dated Aug. 21, 2000 (annexed as Ex. H to 1st Harwood Decl.) ("Zervakos Conv.").  Zervakos' notes from this conversation indicate that Dr. Engel was "difficult to understand" but that she "is electing a single life annuity and an RTB[2] that will be directly rolled over to an IRA until she can find a house."  Id.  There is no evidence that Zervakos recommended the annuity.

_____

[1] The basis for the admissibility of these records of conversations is discussed in section I.D.3 below.

[2] RTB refers to a "Retirement Transition Benefit."  See Authorization to Begin Retirement Income from Retirement Annuities or Group Retirement Annuities, dated Aug. 19, 2000 (annexed as Ex. I to 1st Harwood Decl.) ("Authorization") at 3.

4

On August 22, 2000, Dr. Engel sent a letter to defendants.  See Letter from Mary Engel to TIAA-CREF, dated Aug. 22, 2000 (annexed as Ex. I to 1st Harwood Decl.) ("Aug. 22 Letter").  In this letter, she stated:

> I understand that my accumulation is $1,342,554.81, as of August 21, 2000.  I wish to roll into an IRA $100,000 of this.  Please include Transfer Payout Annuity in the sum on which you base my monthly check.
>
> Please set up single life annuity without a guaranteed period, standard payment method.

Id.  Attached to this letter was an "Authorization to Begin Retirement Income from Retirement Annuities or Group Retirement Annuities," signed by Dr. Engel.  See Authorization.  This form allowed for a choice between various annuity options, some of which had guaranteed periods and some of which allowed for the designation of beneficiaries.  While the form would have allowed the decedent to elect a "Two-Life Annuity" or one with a guaranteed period of 10, 15 or 20 years, Dr. Engel did not mark any of these choices.  Instead, she elected the single life annuity option, which specified that all payments would end at her death.  See Authorization at 1 (selection of "Single life annuity (all payments end with your death)").  On the second page, she was given a choice of choosing to annuitize 100% of her "TIAA Traditional accumulation" or some other amount.  She chose to annuitize 100%.  Id. at 2.

On August 30, 2000, Dr. Engel contacted defendants to confirm receipt of her "request for retirement benefits."  See Record of Conversation Between Pat Litzau and Mary Engel, dated Aug. 30, 2000 (annexed as Ex. J to 1st Harwood Decl.) ("Litzau Conv.") at DEF00282.  A counselor, Pat Litzau, confirmed receipt of Dr. Engel's submissions and informed her that the defendants were still missing information that was necessary to process her requests, including "the amount to be included for the CREF portion of [Dr. Engel's] annuity."  Id.  When Litzau

5

attempted to offer Dr. Engel help with her allocation questions, Dr. Engel declined.  Id. at

DEF00283.  As the conversation continued, Litzau questioned Dr. Engel about her election of a

Single Life Annuity.  Id.  Litzau asked Dr. Engel whether "she really wanted to use all of her

funds in the conversion of a single life annuity knowing all the payments end with her death with

no provision for a beneficiary at all."  Id.  Litzau told Dr. Engel that "at her age and [with] the

balance involved[,] a full annuity would be against normal logic."  Id.  Litzau wrote that Dr.

Engel "appeared very hard of hearing" and that Litzau was not "sure that [Dr. Engel] really

understood what I was asking."  Id.  Dr. Engel then inquired as to when she would expect her

first annuity payment, to which Litzau responded "sometime towards the end of the second week

of September."  Id. at DEF00283-84.

On August 31, 2000, Dr. Engel spoke with TIAA counselor Joyce Heffernan.  See

Record of Conversation Between Joyce Heffernan and Mary Engel, dated Aug. 31, 2000

(annexed as Ex. J to 1st Harwood Decl.) ("Heffernan Conv.") at DEF00285.  After discussing

what Dr. Engel intended to do with the funds she was rolling over, Heffernan "reviewed

investment options and suggested [Dr. Engel] consider the safety of TIAA traditional."  Id. at

DEF00286.  Dr. Engel then noted that she had not heard back with respect her "pending RB

forms" (referring to the request for the annuity).  Id.  The note of conversation states that Dr.

Engel "has submitted forms requesting a SLO  [single life option] with no guarantee period."  Id.

It further states: "[t]here were a number of incomplete items on her forms and [Dr. Engel] was

expecting a callback.  [Dr. Engel] expressed her concern that she would not be receiving a check

on 09/1/00."  Id.  After "checking into" the status of Dr. Engel's application, Heffernan called

back Dr. Engel.  Id.  Heffernan told Dr. Engel that "she needed to submit a letter of confirmation

to clarify the outstanding items in her RB application."  Id.  Heffernan listed a number of items

6

that needed to be confirmed, including that Dr. Engel wants to annuitize "100% of TIAA" and "100% of CREF." Id. at DEF00287. The note states: "I also confirmed again with [Dr. Engel] that she wanted to annuitize 100% with no guarantee period in SLO." Dr. Engel replied that "she was a holocaust survivor and has no family for which she should leave funds." Id. The notes indictate:

> I explained to [Dr. Engel] should she annuitize she would not have a lump sum of cash to access if future expenses should arise. I explained she could not accelerate payments. I suggested an alternative that she could partially annuitize and take MD withdrawals from remaining portions but she would have the benefit of accelerating MD payments or taking single sum withdrawals if she needed to.

Id. Dr. Engel told Heffernan that she "did not realize this was an option and said she needed to think about it." Id. Dr. Engel requested "that an illustration [be] sent to her to assist [her] in her decision." Id. at DEF00287-88. The notes indicate that Heffernan complied with this request. Id.

On September 5, 2000, Dr. Engel wrote a letter to defendants which contained the information that Heffernan had stated was lacking from her forms. See Letter from Mary Engel to Rosemary Odumosu, dated Sept. 5, 2000 (annexed as Ex. K to 1st Harwood Decl.) ("Sept. 5 Letter"). In this letter, Dr. Engel refers to two matters: one is establishing an IRA for $100,000, from which she indicated she needed $34,500 for a down payment on a house. The other matter is the annuity. On this topic she states:

> Confirming: please annuitize transfer payment annuity IE05571-1 in addition to all but $100,000 of total sum.

> Confirming: annuitize 100% remaining TIAA-CREF accounts under the standard method, 0 year survivorship.

Id. At the conclusion of her letter, Dr. Engel states, "I am ill and cannot come to your offices. My request to you suffers from lack of continuity; I have spoken to many counselors and written

and sent materials.  Yet, nothing of substance appears to happen."  Id.

On September 8, 2000, Dr. Engel spoke with TIAA counselor Rosemary Odumoso.  See Record of Conversation Between Rosemary Odumosu and Mary Engel, dated Sept. 8, 2000 (annexed as Ex. E to Wild Decl.) ("Odumosu Conv.").  During this conversation, Dr. Engel expressed frustration at not having received "a payment."  Id.  From previous communications, it appears the "payment" referenced by Dr. Engel was the $34,500 that was to come from her IRA account, not an annuity payment.  Compare Sept. 5 Letter, with Odumosu Conv.  Odumoso informed Dr. Engel that they needed certain information in writing.  Odumosu Conv.  Odumoso stated that Dr. Engel "seemed very confused" and that she agreed to fax Odumoso a letter containing the information requested.  Id.

On September 12, 2000, defendants sent Dr. Engel an "Acknowledgment of Request for Annuity Payments" ("Acknowledgment"), which provided Dr. Engel with a summary of the annuity benefit she had elected.  See Acknowledgment of Request for Annuity Payments, dated Sept. 12, 2000 (annexed as Ex. L to 1st Harwood Decl.) at 1.  The Acknowledgment states that Dr. Engel had elected a "Life Annuity With No Guaranteed Period," and that under the option selected, "you receive lifetime income.  Upon your death, all payments stop."  Id. at 2.  It also stated, "There is no beneficiary under the Life Annuity With No Guaranteed Period."  Id.  In addition, the Acknowledgment directed Dr. Engel to call defendants "as soon as possible before [her] income starting date" in the event Dr. Engel determined that any of the information within the Acknowledgment was incorrect so that defendants could make changes.  See id. at 4.

In early September, TIAA issued two annuity contracts.  See TIAA Traditional Payout Annuity Contract One-Life Annuity, dated Sept. 1, 2000 (annexed as Ex. M to 1st Harwood Decl.); Real Estate Account One-Life Unit-Annuity, dated Sept. 6, 2000 (annexed as Ex. N to 1st

8

Harwood Decl.).  It also issued a document called "Your Service Directory" which summarized

the terms of the contracts.  See Your Service Directory (annexed Ex. O to 1st Harwood Decl.).

Under "income option," it stated that the annuity was a "Life Annuity With No Guaranteed

Period – Under this option, you receive income.  Upon your death, all payments stop."  Id.

On September 14, 2000, Dr. Engel contacted defendants.  See Record of Conversation

Between Tom Toxby and Mary Engel, dated Sept. 14, 2000 (annexed as Ex. E to Wild Decl.)

("Toxby Conv.").  The counselor, Tom Toxby, wrote that "this woman was difficult to deal with.

She is very frustrated with how [TIAA] handled her account our lack of effort in sending her an

IRA [withdrawal] of $34,500 for a down payment on a house, in addition she complained how

long it took to get an annuity payment."  Id. at 1.  Toxby then wrote: "[t]his poor lady could have

used some counseling, as she annuitized over $1 million dollars and chose no guaranteed peroid

[sic], and she sounds frail."  Id.  The note includes a direction to "rush" Dr. Engel's payment of

$34,500 to her as "she needs it for a down payment on a house."  Id. at 2.

On September 26, 2000, Norm Krenick, an "Individual Correspondent," employed by

TIAA-CREF, sent a letter to Dr. Engel summarizing her annuity benefit.  See Letter from Norm

Krenick to Mary Engel, dated Sept. 26, 2000 (annexed as Ex. E to Wild Decl.).  In this letter,

Krenick states that Dr. Engel's annuities, TIAA Contract Y043307-1 and CREF Certificate

Z043307-9, were a "Single Life Annuity" which paid Dr. Engel a variable monthly income

depending on investment earnings.  Id.  In addition, Krenick's letter states that "all payment will

cease at your death."  Id.

Following the creation of her Single Life Annuity, Dr. Engel continued to have

communications with defendants' counselors.  On January 19, 2001, Dr. Engel spoke with TIAA

counselor Sharon Kyle.  See Record of Conversation Between Sharon Kyle and Mary Engel,

9

dated Jan. 19, 2001 (annexed as Ex. E to Wild Decl.).  During this conversation, Dr. Engel asked

Kyle what had happened to "the TPA contract."[3]  Id.  Kyle told Dr. Engel that "she [had]

converted [the contract] to another payment option, the annuity option."  Id.

On March 10, 2001, Dr. Engel died.  See Certificate of Death (annexed as Ex. C to

Plaintiff's Declaration in Support of Motion for Summary Judgment, filed Dec. 30, 2010

(Docket # 81) ("Pl. Decl.")).  The cause of Dr. Engel's death was determined to be

"pseudomonas pnuemonia [sic]," a "consequence of severe, end stage emphysema." Id.

    B.    Public Statements By TIAA

TIAA is "one of the largest and most respected financial service providers in the world."

About TIAA-CREF (annexed as Ex. C to Wild Decl.).  The products that defendants offer to

their customers include life insurance, estate planning, investment products, and advisory

services.  See 1st R. Admit at 14-15 ¶ 43.  On their website and in their annual report, defendants

have held themselves out as a "family of companies," The TIAA-CREF Family of Companies

(annexed as Ex. C to Wild Decl.), that seek to "build lasting partnerships with all [of their]

customers, by providing the products they will need throughout their lives and by offering

choices appropriate to their changing situations."  TIAA-CREF 2001 Annual Report (annexed as

Ex. C to Wild Decl.) ("Annual Report") at 1.  They also state that they "provide [various

financial] products – and the advisory services they require – when our customers need them."

Annual Report at 1.

The report refers to TIAA's "lifetime partnerships" with customers and states that its

products "can help almost anyone plan for retirement and savings goals and protect against

---

[3] It appears that the "TPA Contract" refers to Dr. Engel's Transfer Payout Annuity that was
referenced in letters in early 2000.  See, e.g., Letter from Mary Engel to Donald Smith, dated
Feb. 8, 2000 (annexed as Ex. G to 1st Harwood Decl.); Aug. 22 Letter.

risks." Id.  The report states that they have created "an education infrastructure to help people

identify resources that best fit their needs as they pass from one period of life to another." Id.  It

further states that TIAA's "commitment to building partnerships rather than just accounts drives

us to go well beyond fulfilling transactional responsibilities . . . . It also means helping people

understand their choices and make sound decisions." Id. at 4.

In addition, defendants' vice-president, Richard A. Hiller, testified to Congress that trust

is a "crucial dimension" of an individual's relationship with her financial services firm, and that

the "responsibilities of a fiduciary advisor are standards that [TIAA] operates under." See

Testimony of Richard A. Hiller, dated July 17, 2001 (annexed as Ex. H to Wild Decl.) at 5.

C.    Procedural History

The plaintiff filed the original complaint in this action on August 20, 2003 alleging

claims for negligence, breach of fiduciary duty, and fraud. See Complaint, filed Aug. 20, 2003

(Docket # 1).  On October 3, 2003, defendants moved to dismiss the complaint. See Notice of

Motion, filed Oct. 3, 2003 (Docket # 4).  On August 14, 2006, the district court, per the

Honorable Deborah A. Batts, granted defendants motion to dismiss, dismissing plaintiff's

complaint in its entirety. See Muller-Paisner v. TIAA, 446 F. Supp. 2d 221 (S.D.N.Y. 2006).

In an unpublished decision issued on August 15, 2008, the Second Circuit affirmed in

part and reversed in part the district court's dismissal. See Muller-Paisner v. TIAA, 289 F.

App'x 461, 466 (2d Cir. 2008) (summary order) ("Muller-Paisner II").  While the court affirmed

the district court's dismissal of plaintiff's fraud claims, id. at 465, the court found that the

complaint contained sufficient allegations with respect to plaintiff's breach of fiduciary duty and

negligence claims to survive a motion to dismiss, id. at 466.  The court provided the following

reasoning for its decision:

11

By their nature, arms-length commercial transactions ordinarily do not involve relationships defined by the New York courts as fiduciary.  See Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002).  However, a fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence. See id. ("A debtor-creditor relationship is not by itself a fiduciary relationship although the addition of a relationship of confidence, trust, or superior knowledge or control may indicate that such a relationship exists." (internal quotations omitted)); Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993)  (noting that although no fiduciary duties arise in the ordinary debtor/creditor relationship, they may arise under the proper circumstances) (quoting Fisher v. Bishop, 108 N.Y. 25, 28 (1888)); [Murphy v. Kuhn, 90 N.Y.2d 266, 270-72 (1997)] (noting that fiduciary duties may arise in the insurance context if the requisite trust and confidence is established); Batas v. Prudential Ins. Co.of Am., 281 A.D.2d 260, 724 N.Y.S.2d 3, 7(1st Dep't 2001) (recognizing that fiduciary duties may arise in the insurance context where circumstances are appropriate).

In this case, the complaint alleges that the defendants advertise that they have many insurance products and investment options, and that they will assist customers in purchasing the best option available to them in order to maximize their income for the balance of their post-retirement lives.  The complaint also alleges that the defendants advertise that they have a considerable infrastructure to help people identify the resources that best fit their needs. Additionally, the complaint alleges that the defendants target these advertisements to a specific class of people, retired educators.  Moreover, in her reply brief Muller-Paisner cites public statements of employees of the defendants including statements in congressional testimony and on the defendants' website, to the effect that they offer a wide range of investment products, that they will help their customers choose among those products, and that trust is a crucial dimension of the relationship between the defendants and their customers.  We conclude that under the applicable standards Muller-Paisner's allegations regarding the existence of a duty, for the purposes of both the fiduciary duty and negligence claims, are sufficient to withstand the defendants' motion to dismiss.  See, e.g., [Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506, 546-47 (S.D.N.Y. 1997)] (allowing breach of fiduciary duty claim against insurer to proceed to discovery in light of allegations similar to those at issue here).

Muller-Paisner II, 289 F. App'x at 466 (footnote omitted).

Following the decision in Muller-Paisner II, plaintiff filed an amended complaint alleging the following claims: (1) breach of fiduciary duty, (2) negligence, (3) unjust enrichment, and (4) rescission.  See Amended Complaint, filed Nov. 21, 2008 (Docket # 21) ("Am.

12

Compl."). On June 1, 2009, the parties consented to having this matter decided by a United

States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Following discovery, defendants made

a motion for summary judgment.[4] Plaintiff cross-moved for summary judgment.[5] Plaintiff also

filed a motion to strike certain documents submitted by defendants in support of their motion for

summary judgment.[6]

On September 27, 2011, this Court held an oral argument at which it denied plaintiff's

motion to strike. See Sept. 27 Order. The Court also held that New York's Dead Man's Statute,

N.Y. Civ. Prac. Law. & R. § 4519 – which plaintiff sought to use to bar evidence submitted by

defendants – was not applicable. See Transcript of Proceedings Before Honorable Gabriel W.

---

[4] See Notice of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 69); Declaration of Jonathan R. Harwood, filed Dec. 20, 2010 (Docket # 70); Defendants' Memorandum of Law in Support of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 71); Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed Dec. 20, 2010 (Docket # 72); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed Apr. 7, 2011 (Docket # 94); Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment, filed Apr. 29, 2011 (Docket # 96); 1st Harwood Decl.

[5] See Notice of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 73); Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 74) ("Pl. Mem. of Law"); Wild Decl.; Pl. 56.1 Statement; Pl. Decl.; 1st Weinberg Decl.; Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment – Matthew Hutcheson, filed Dec. 20, 2010 (Docket # 76) ("Hutcheson Decl."); Declaration of Jonathan R. Harwood, filed Apr. 7, 2011 (Docket # 90); Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, filed Apr. 7, 2011 (Docket # 91) ("Def. Opp. Mem. of Law"); Ahearn Aff.; Def. Counter 56.1 Statement; Plaintiff's Memorandum of Law in Reply to Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Apr. 29 and 30, 2011 (Docket ## 100, 101).

[6] See Notice of Motion to Strike Declaration, Exhibits and Rule 56.1 Statement, filed Apr. 7, 2011 (Docket # 88); Plaintiff's Memorandum of Law in Support of Motion for to [sic] Strike Declaration, Annexed Exhibits and Local Rule 56.1 Statement, filed Apr. 10, 2011 (Docket # 95); Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Strike, filed Apr. 29, 2011 (Docket # 98); Plaintiff's Memorandum of Law in Reply to Defendants' Brief in Opposition to Plaintiff's Motion to Strike, filed May 16, 2011 (Docket # 102).

Gorenstein, dated Sept. 27, 2011 (Docket # 104) ("Sept. 27 Tr.") at 4, 8.  The Court granted

partial summary judgment on the question of whether defendants owed Dr. Engel a fiduciary

duty principally on the ground that the Court viewed the Second Circuit's decision as compelling

this result.  See id. at 14; Sept. 27 Order.  Finally, the Court stated that the parties' briefing was

inadequate as to whether there had been a breach of fiduciary duty and therefore asked the

parties to further brief this point.  See Sept. 27 Tr. 5-7.  Following that conference, both parties

submitted further papers on this issue.[7]   Included in these papers were additional declarations in

support of their motions.  See, e.g., Pryor Aff.; 2d Harwood Decl.; 2d Weinberg Decl.; Pl. Reply

Decl.

D.    Objections to Documents

Before turning to a discussion of the case, we address certain procedural matters raised

by the parties.

---

[7] See Notice of Motion, filed Dec. 5, 2011 (Docket # 108); Memorandum of Law in Support of
Defendants' Renewed Motion for Summary Judgment, filed Dec. 5, 2011 (Docket # 109) ("Def.
Renewed Mem. of Law"); Declaration of Jonathan R. Harwood, filed Dec. 5, 2011 (Docket
# 110) ("2d Harwood Support Decl."); Notice of Renewed Motion for Summary Judgment, filed
Jan. 17, 2012 (Docket # 111); Declaration of Max Wild in Support of Plaintiff's Renewed
Motion for Summary Judgment, filed Jan. 17, 2012 (Docket # 112); Plaintiff's Memorandum of
Law in Support of Plaintiff's Renewed Motion for Summary Judgment and in Opposition to
Defendants' Renewed Motion for Summary Judgment, filed Jan. 17, 2012 (Docket ## 113, 114)
("Pl. Renewed Mem. of Law"); Declaration of Jonathan R. Harwood, filed Feb. 7, 2012 (Docket
# 116); Affidavit of Jeremy Young, filed Feb. 7, 2012 (Docket # 117); Defendants'
Memorandum of Law in Further Support of Their Renewed Motion for Summary Judgment and
in Opposition to Plaintiff's Renewed Motion for Summary Judgment, filed Feb. 7, 2012 (Docket
# 118) ("Def. Renewed Opp. Mem. of Law"); Affidavit of Carranza Pryor, filed Feb. 7, 2012
(Docket # 119) ("Pryor Aff."); 2d Weinberg Decl.; Plaintiff's Supplemental Declaration in
Support of Renewed Motion for Summary Judgment, filed Feb. 28, 2012 (Docket # 121) ("Pl.
Reply Decl."); Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's
Renewed Motion for Summary Judgment and in Opposition to Defendant's Renewed Motion for
Summary Judgment and in Further Support for Plaintiff's Motion, filed Feb. 28, 2012 (Docket
# 122) ("Pl. Renewed Reply").

1.      Objections to Late-Filed Documents and to Rule 56.1 Statement

Plaintiff has made some objections to documents in the summary judgment record on the ground that they were not filed as part of the original summary judgment papers.  See, e.g., Pl. Renewed Reply at 13 (objecting to Pryor Aff.).  It is important, however, that the fullest possible record be considered by the Court so that the Court can determine the parties' entitlement to summary judgment based on the record that would actually be presented to the jury.  Accordingly, we reject plaintiff's objections to the late corrections or additions because plaintiff filed the final papers in this matter (which themselves include two new declarations) and has had a full opportunity to respond to all contentions and submissions of the defendant.  For similar reasons we excuse any purported inadequacies in the defendants' Rule 56.1 statement.  See generally Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ("A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

2.      Declaration of Matthew D. Hutcheson

We next address the declaration of plaintiff's expert, Matthew D. Hutcheson, who is said to be an expert in "fiduciary standards of care, conflicts of interest, and fiduciary prudence." Hutcheson Decl. ¶ 2 (emphasis omitted); see also Report Prepared for Max Wild, Attorney at Law Re: Vera Muller-Paisner v. [TIAA], dated Jan. 20, 2012 (attached to Hutcheson Decl.) ("Hutcheson Report").  In both the declaration and report, Hutcheson opines that defendants owed both a fiduciary duty and a duty to provide non-negligent investment advice to Dr. Engel, and subsequently breached both duties.  See Hutcheson Decl. ¶¶ 4-5; Hutcheson Report at 7 ("It is my opinion that TIAA-CREF owed a fiduciary duty to decedent. . . . TIAA-CREF assumed the duty of providing non-negligent investment advice to decedent. . . . TIAA-CREF breached its fiduciary duty to [Dr. Engel]. . . . TIAA-CREF breached its duty to [Dr. Engel] by failing to

recommend or at least explain and compare other available options to decedent . . . .").   Our task

on this summary judgment motion, however, is to determine whether, as a matter of law, either

side's evidence entitles it to summary judgment on these questions.   The affidavit is inadmissible

because, while an expert "may opine on an issue of fact within the jury's province," an expert

"may not give testimony stating ultimate legal conclusions based on those facts."   United States

v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991); see also Hygh v. Jacobs, 961 F.2d 359, 363 (2d

Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert

testimony that expresses a legal conclusion.") (citing cases).   Because "the admissibility of

evidence on a motion for summary judgment is subject to the same rules that govern the

admissibility of evidence at trial," Harris v. Key Bank Nat'l. Ass'n, 193 F. Supp. 2d 707, 716

(W.D.N.Y. 2002) (internal quotation marks and citation omitted); accord Raskin v. Wyatt Co.,

125 F.3d 55, 66 (2d Cir. 1997), a court considering a motion for summary judgment must

disregard an expert's affidavit, declaration, or report if that document consists of material that

would not be admissible at trial, see Harris 193 F. Supp. 2d at 716; Darby v. Sys. Transport, Inc.,

2001 WL 1188171, at *6 (W.D.N.Y. Oct. 3, 2001) ("a court can only consider the affidavit of an

expert witness on a motion for summary judgment if that expert's testimony would be

admissible at trial.").   Hutcheson's report and declaration are inadmissible inasmuch as they state

an opinion regarding the ultimate question to be decided on this motion for summary judgment:

whether the facts show that TIAA owed Dr. Engel a fiduciary duty and whether it breached that

duty.

### 3.      The TIAA Call Sheets

Finally, we address the admissibility of the "call sheets" – that is, the telephone records

that were made by TIAA counselors of their conversations with plaintiff.

16

To the extent that plaintiff is arguing that these records are not authentic, the Court

rejects this argument.  Federal Rule of Evidence 901(a) provides that "[t]o satisfy the

requirement of authenticating or identifying an item of evidence, the proponent must produce

evidence sufficient to support a finding that the item is what the proponent claims it is."  The

rule "does not erect a particularly high hurdle."  United States v. Dhinsa, 243 F.3d 635, 658 (2d

Cir. 2001) (internal quotation marks and citation omitted).  Here there is ample evidence that

these records are what they purport to be.  First, there is an extensive affidavit from Robert

Ahearn, the director of the call center, describing telephone records in general and how they are

maintained.  See Ahearn Aff.  Second, TIAA's general counsel has stated under oath that these

documents are "true and correct" copies of documents from TIAA's files.  See Pryor Aff. ¶ 3.

Plaintiff has submitted absolutely no evidence that would suggest the documents are not

authentic and, indeed, quotes the ones favorable to her extensively in support of her own motion.

As a result, "it seems reasonably probable that the [telephone records] are what [they] purport[]

to be," and thus "the command of Rule 901(a) is satisfied."  Dhinsa, 243 F.3d at 658 (internal

quotation marks and citation omitted).[8]

Plaintiff's hearsay objection to the call sheets is also rejected.  One exception to the

hearsay rule, see Fed. R. Evid. 802, is for "records of a regularly conducted activity," Fed. R.

Evid. 803(6), commonly known as the "business records exception."  Rule 803(6) provides for

---

[8]  We reject plaintiff's suggestion that Pryor's affidavit be struck or that she is entitled to further
discovery on the topic of the authenticity of the call sheets.  See Pl. Renewed Reply at 16-19.
During the discovery period, plaintiff had every opportunity to depose defendants on the
authenticity or any other aspect of the call sheets, and indeed did so.  To the extent plaintiff
asserts that particular questions she asked of Pryor at his deposition were subject to an objection
regarding attorney-client privilege or evasive answers, id. at 18, nothing in her brief suggests that
Pryor improperly refused to answer questions that related to his knowledge of the authenticity of
the records.  In any event, any dispute about discovery matters was required to be raised before
discovery closed.

the admission of:

> [a] record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and
> (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Id.  "The purpose of the rule is to ensure that documents were not created for 'personal purpose[s] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'"  United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010) (quoting United States v. Friedin, 849 F.2d 716, 719 (2d Cir. 1988)).  In general, Rule 803(6) "favors the admission of evidence rather than its exclusion if [the evidence] has any probative value at all."  United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (internal quotation marks and citation omitted); Kaiser, 609 F.3d at 574.

        The call sheets easily meet the business records exception.  Each of the elements of the exception is set forth in the Ahearn affidavit.  This affidavit is based on Ahearns' personal knowledge as director of the call center and reflects that (1) the telephone record entries were made at or near the time of the telephone call, see Ahearn Aff. ¶ 4 ("Each counselor was required to prepare the call sheet either during the actual call or immediately thereafter. . . . [W]hen a counselor in a call center received a call, the system in place would indicate that the counselor was occupied and unavailable to receive another call.  The counselor would not become available again until [he] or she completed the call and the requisite call sheet."); (2) they were made by a person with knowledge of the contents of that call, see id. ¶ 3 ("All

counselors were required to create call sheets for every telephone call they had with a participant."); (3) they were kept in the course of TIAA's regularly conducted business activity of taking calls from customers, <u>see id.</u> ¶ 3 ("[TIAA's] policies required that all calls with participants handled in the call centers, including the Pension/Annuity Call Center, be documented on call sheets."); <u>id.</u> ¶ 4 ("TIAA's policies and procedures required that a separate call sheet  be created for each telephone call with a participant."), and (4) it was the regular practice of TIAA-CREF to make these memoranda of telephone calls, <u>see id.</u>

    The fact that a record is not "mechanically generated" does not prohibit its admission. As long as evidence demonstrates that the memoranda "[were] maintained in a consistent way and [were] focused on a certain range of issues that were relevant to [the defendants'] business," they may be admitted as a business record.  <u>Kaiser</u>, 609 F.3d at 575; <u>see</u> <u>also</u> <u>United States v. Ford</u>, 435 F.3d 204, 214-15 (2d Cir. 2006).  The Ahearn affidavit provides such evidence, in that it states that counselors in defendants' call centers were required to generate these memoranda every time a telephone conversation occurred with a participant.  <u>See</u> Ahearn Aff. ¶¶ 3, 4.

    Plaintiff cites to the depositions of Ahearn, David Stetch, Jeremy Young, and Mary Lou Boccio, as evidence that these memoranda were not regularly generated.  <u>See</u> Pl. Renewed Reply at 14-15.  But their testimony is consistent with the Ahearn declaration and shows that employees in the call centers were required to generate memoranda after each phone conversation with a participant.  <u>See</u> Deposition of Robert Ahearn, dated Aug. 6, 2009 (annexed as Ex. R to 1st Harwood Decl.) at 49; Deposition of David Stetch, dated June 24, 2009 (annexed as Ex. U to 1st Harwood Decl.) ("Stetch Dep.") at 115; Deposition of Mary Lou Boccio, dated July 2, 2009 (annexed as Ex. S to 1st Harwood Decl.) at 66-68, 71.  At most, these depositions demonstrate that there was no uniform TIAA policy as to exactly what portions of the

conversation were to be included in the memoranda.  The fact that the policy was not so detailed does not take the records out of the Rule 803(6) exception.[9]

## II.   LAW GOVERNING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal quotation marks and citation omitted).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party.  Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original) (internal quotation marks and citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing

---

[9] The Court notes that the Ahern affidavit speaks to the conduct only of call center employees and does not discuss non-call center employees' activities.  As such, the affidavit does not establish a foundation for the admission under Rule 803(6) of memoranda prepared by non-call center employee, David Stetch.  See Stetch Dep. at 115 (Stetch was not a call center employee and was not required to summarize his conversations with participants).  Accordingly, the Court will not consider the memoranda prepared by Stetch, see Record of Conversation Between David Stetch and Mary Engel, dated Aug. 22, 2000 (annexed as Exs. H and P to 1st Harwood Decl. and annexed as Ex. C to 2d Harwood Decl.), inasmuch as the defendants have not provided evidence that these memoranda qualify as business records or that they are admissible on any other basis.

cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable

juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Where "the nonmoving

party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to

make a showing sufficient to establish the existence of an element essential to [its] case."

Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (internal

quotation marks omitted) (alteration in original).  Thus, "[a] defendant moving for summary

judgment must prevail if the plaintiff fails to come forward with enough evidence to create a

genuine factual issue to be tried with respect to an element essential to its case."  Allen v.

Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

III.      DISCUSSION

     A.      Law Governing Fiduciary Duty and Negligence Claims

     To establish a claim for breach of fiduciary duty, in New York, a plaintiff must show (1)

the existence of a fiduciary duty; and (2) breach of that duty.  See EBC I, Inc. v. Goldman, Sachs

& Co., 5 N.Y.3d 11, 19-22 (2005); In re NYSE Specialists Sec. Litig, 405 F. Supp. 2d 281, 302

(S.D.N.Y. 2005), rev'd on other grounds, 503 F.3d 89 (2d Cir. 2007).  To establish an action for

negligence, the plaintiff must prove the following three elements: "'(1) the existence of a duty on

defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result

thereof.'"  Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000) (quoting Akins v.

Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333 (1981)).  In this case, "[t]he 'duty' element of

these two causes of action requires the same inquiry."  Muller-Paisner II, 289 F. App'x at 465.

Thus, the first question that must be answered is whether plaintiff's evidence would allow a

reasonable jury to conclude that defendants owed Dr. Engel a duty.  The only duty at issue is a

fiduciary duty.

21

"A fiduciary relationship exists . . . when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks, alterations, and citation omitted); accord Sokol Holdings, Inc. v. BMB Munai, Inc., 726 F. Supp. 2d 291, 306 (S.D.N.Y. 2010).  When determining whether a fiduciary duty exists, courts generally look to the following factors: "[1] the nature of the relationship [between the parties]; [2] whether the alleged fiduciary had or appeared to have unique or special expertise; [3] whether the alleged fiduciary was aware of the use to which information would be put; and [4] the purpose for which the information was supplied." Muller-Paisner II, 289 F. App'x at 465; accord Kimmel v. Schaefer, 89 N.Y.2d 257, 264 (1996).

New York courts have consistently held that a fiduciary relationship does not exist between an insurance company and its insured.  See, e.g., Murphy v. Kuhn, 90 N.Y.2d 266, 270 (1997) ("Generally, the law is reasonably settled on initial principles that insurance agents . . . have no continuing duty to advise, guide or direct a client . . . ."); Schandler v. N.Y. Life Ins. Co., 2011 WL 1642574, at *12 (S.D.N.Y. Apr. 26, 2011) ("[U]nder New York law the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one.") (quoting Freeman v. MBL Life Assur. Corp., 60 F. Supp. 2d 259, 266 (S.D.N.Y. 1999)).  Furthermore, the fact that an insurer has superior knowledge about its products is insufficient to establish the existence of a fiduciary relationship between an insurer and insured.  See RNK Capital LLC v. Natsource LLC, 76 A.D.3d 840, 842 (1st Dep't 2010); Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 264 (1st Dep't 2001); Phillips v. Am. Int'l Grp., Inc., 498 F. Supp.2d 690, 696 (S.D.N.Y. 2007).  In addition, a fiduciary relationship cannot exist where parties are involved in a mere arm's-length commercial transaction.  See In re Mid-

22

Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002)

("[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or

trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary

circumstances.") (quoting Pan Am. Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y.

1994)) (alteration in original).  However, a plaintiff may establish the existence of a fiduciary

duty by presenting facts that establish that the relationship between the parties was more than a

mere arm's length association and was one of trust and confidence.  See Muller-Paisner II, 289

F. App'x at 466; In re Mid-Island Hosp., 276 F.3d at 130; Murphy, 90 N.Y.2d at 270-71;

Schandler, 2011 WL 1642574, at *12; accord Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.

LLC, 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005) (creation of fiduciary duty turns on whether

plaintiff "has reposed trust or confidence in the integrity or fidelity of [defendant] who thereby

gains a resulting superiority of influence over [plaintiff], or when [defendant] assumes control

and responsibility over another").

      Muller-Paisner has argued that she is entitled to summary judgment on the question of

whether defendants owed Dr. Engel a fiduciary duty because the defendants have admitted the

facts the Second Circuit held were sufficient to withstand a motion to dismiss on this question.

See Pl. Mem. of Law at 20-21.  While the Court originally accepted this argument, see Sept. 27

Tr. 5, it has since reconsidered its decision as it is permitted to do.  See, e.g., Aramony v. United

Way of Am., 254 F.3d 403, 410 (2d Cir. 2001) (law of the case doctrine "is discretionary and

does not limit a court's power to reconsider its own decisions prior to final judgment") (citation

and internal quotation marks omitted).  Upon reflection, the Court has concluded that Muller-

Paisner II did not hold that plaintiff's allegations, if proven, were sufficient to establish a

fiduciary duty.  Instead the Second Circuit stated that plaintiff's allegations were "sufficient to

withstand the defendants' motion to dismiss" and followed this statement by a citation to the case of <u>Dornberger</u>, 961 F. Supp. at 546-47, which, the Second Circuit noted, "allow[ed] [a] breach of fiduciary duty claim against [an] insurer to <u>proceed to discovery</u> in light of allegations similar to those at issue here." <u>Muller-Paisner II</u>, 289 F. App'x at 466 (emphasis added). Notably, the <u>Dornberger</u> case itself stated that "a jury should be permitted to inquire into the nature of the relationship between an insurer and its insureds to assess whether a relationship of trust and confidence existed." 961 F. Supp. at 546-47. This is in accordance with case law holding that the "existence of a fiduciary relationship is often a 'fact intensive' inquiry appropriate for a jury." <u>See</u>, <u>e.g.</u>, <u>Faulkner v. Arista Records LLC</u>, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009); <u>accord</u> <u>EBC I</u>, 5 N.Y.3d at 22 n.5 ("whether an underwriter had fiduciary obligations to the issuer of an IPO is a fact-specific determination to be made by the factfinder").[10] Thus, we conclude that the question of whether defendants owed Dr. Engel a fiduciary duty is a question of fact best left to a jury to decide.

There will be no need to present this matter to a jury, however, because we conclude in the next section that even assuming the existence of a fiduciary duty, a reasonable jury could not find that this duty was breached.[11]

---

[10] This case law stands in contrast with the question of whether a duty exists in the case of a cause of action for negligence. New York law holds that in such cases "it is for the courts first to determine whether any duty exists." <u>Darby v. Compagnie Nat'l Air France</u>, 96 N.Y.2d 343, 347 (2001); <u>accord</u> <u>Gadani v. Dormitory Auth. of State of N.Y.</u>, 64 A.D.3d 1098, 1102 (3d Dep't 2009) ("the existence of a duty is a question of law to be determined by the courts").

[11] While it is not necessary to reach the question at this time, there may also be a question of fact as to whether Dr. Engel was aware of any statements made by TIAA that created the fiduciary duty. TIAA argues that this factual issue is relevant to the issue of whether plaintiff can prove "reliance" for purposes of asserting a breach of fiduciary duty. Def. Renewed Opp. Mem. of Law at 31. But in the Court's view, awareness of TIAA's statements goes to the issue of whether the duty was created at all. If such a duty existed, there would be no need for plaintiff to prove that she "relied" on TIAA's statements that created the fiduciary duty in order to prove that the duty was breached.

B.      Breach of Fiduciary Duty

"The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  Armentano v. Paraco Gas Corp., 90 A.D.3d 683, 684-85 (2d Dep't 2011) (internal quotation marks and citation omitted).  Although neither party is entitled to summary judgment on the question of whether there was a fiduciary relationship, they have both moved for summary judgment on the question of whether there was a breach of that duty – often phrased as "misconduct," see id. – either through self-dealing or in some other manner.

Accepting all of plaintiff's admissible evidence as true, and granting plaintiff all reasonable inferences, the Court concludes that a reasonable jury could not find in plaintiff's favor on this question.

Plaintiff's arguments on the question of breach and the standard of care that TIAA owed Dr. Engel rely heavily on cases in which the person holding the fiduciary holds one of the classic positions for which a fiduciary duty is imposed: for example, trustee, partner, director of a corporation, or agent to a principal.[12]  In such situations, case law recognizes that the fiduciary owes a duty of "undivided and undiluted loyalty to those whose interests the fiduciary is to protect."  Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466 (1989); accord Morales v. Galeazzi, 72

_____

[12]  See, e.g., Birnbaum v. Birnbaum, 73 N.Y.2d 461 (1989) (partner); Meinhard v. Salmon, 249 N.Y. 458 (1928) (manager in joint business venture); In re Estate of Rothko, 43 N.Y.2d 305 (1977) (executor); Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969 (2d Cir. 1991) (partner); Ajettix Inc. v. Raub, 9 Misc. 3d 908 (Sup. Ct. 2005) (corporate officer and director); Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264 (2d Cir. 1986) (corporate director); Albright v. Jefferson Cnty. Nat'l Bank, 292 N.Y. 31 (1944) (trustee); Commander Terminals Holdings, LLC v. Poznanski, 84 A.D.3d 1005 (2d Dep't 2011) (corporate officer); In re Heller, 6 N.Y.3d 649 (2006) (trustee); Greene v. Greene, 56 N.Y.2d 86 (1982) (attorney-client).

25

A.D.3d 765, 766 (2d Dep't 2010).  Plaintiff cites repeatedly to cases in which trustees and others

with a fiduciary duty who are entrusted with funds have been found by courts to have committed

misconduct when they entered into business arrangements involving those funds or took actions

that benefitted them while using beneficiary funds.  See Pl. Renewed Mem. of Law at 25-32.  As

might be expected, plaintiff's brief, see id. at 26, 27, cites to Judge Cardozo's famous declaration

that "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of

behavior" of a fiduciary.  Meinhard v. Salmon, 249 N.Y.458, 463-64 (1928).

As a matter of logic, however, these cases cannot possibly set the governing standard

here because the relationship between Dr. Engel and TIAA was of an entirely different character.

TIAA was not an agent of Dr. Engel.  TIAA did not act as a trustee of or otherwise control Dr.

Engel's funds, and the statements that TIAA made that support the creation of a fiduciary duty

do not even remotely suggest that it was undertaking to make the decisions to manage those

funds.  Plaintiff argues, without citation to authority, that "[f]iduciaries are fiduciaries no matter

whether it is because they are partners, trustees, corporate officers, stockbrokers, lawyers,

spouses, doctors or on some other factual basis, even one not yet ruled upon."  Pl. Renewed

Mem. of Law at 24.  Thus plaintiff contends that TIAA's actions in this matter should be judged

by the same yardstick as would be used to judge a trustee who used trust assets to make a

transaction that benefits the trustee.  Continuing logically from this premise, plaintiff faults

TIAA for not suggesting to Dr. Engel that she consider annuities that would be available from

TIAA's competitors, id. at 6, 50; for not suggesting that she might be able "to get a better deal

with one of them," id. at 50; and for not describing to Dr. Engel the "economic benefits

defendants would derive from selling their own products versus a competitors'," id. at 8; accord

id. at 50.

From plaintiff's point of view, this Court should apply the same tests to TIAA's sale of the annuity to Dr. Engel as we would apply if TIAA had been appointed trustee of a trust containing Dr. Engel's savings and, of all the available options for the maintenance of her savings and out of all the available sellers of financial products, had chosen to purchase on her behalf an annuity from TIAA.  Obviously, such conduct by a trustee would be improper and would be barred as "blatant self-dealing."  Birnbaum, 73 N.Y.2d at 466.  A trustee in this situation would instead be expected to determine the best possible allocation of financial resources and, if it were decided that an annuity was in Dr. Engel's best interests, to choose an annuity company that would provide the annuity at the lowest cost and with the greatest reliability.

The Court does not accept, however, that the standards for conduct that apply to a trustee and other fiduciaries who plainly have a duty of undivided loyalty apply here.  The parties' briefing provides very little insight into the question of what other standard should apply or how a jury could even be instructed on this point.  The New York Pattern Jury Instructions assume the highest standard and thus would direct the Court to instruct the jury that TIAA owed Dr. Engel "undivided and unqualified loyalty" and that it could not act "in any manner contrary to the interests of" Dr. Engel.  See N.Y. Pattern Jury Instr. – Civil § 3:59.  It seems beyond peradventure to the Court, however, that TIAA cannot be expected to give "unqualified loyalty" to an individual who is a customer of its business, even if the customer has placed trust and confidence in it.

Rather, the circumstances that gave rise to the fiduciary relationship between Dr. Engel and TIAA must provide the standard for determining whether the fiduciary duty has been violated.  See generally Restatement (Second) of Torts § 874, comment a (a fiduciary

27

relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation") (emphasis added). Some insight may be gleaned from cases involving the broker-customer relationship, which recognize that the fiduciary duty that may arise in those circumstances is circumscribed. For example, in Press v. Chemical Investment Services Corp., 166 F.3d 529, 536 (2d Cir. 1999), the Second Circuit noted that "cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested." In Kwiatkowski v. Bear, Stearns & Co., 1999 WL 1277245 (S.D.N.Y. Nov. 29, 1999), the court noted "that the duties a broker owes to its client require[] attention to the specific circumstances of the relationship between the broker and the client and the scope of the matters entrusted to the broker," id. at *10 (emphasis added); accord Bissell v. Merrill Lynch & Co., 937 F. Supp. 237, 246 (S.D.N.Y. 1996) ("The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and the scope of affairs entrusted to a broker is generally limited to the completion of a transaction.") (citation, punctuation, and internal quotation marks omitted); see also Saboundjian v Bank Audi (USA), 157 A.D.2d 278, 283 (1st Dep't 1990) ("broker has a duty to execute to [an order] in accordance with the instructions given").

Once case the Court finds to be helpful is EBC I, in which the New York Court of Appeals found that Goldman Sachs & Co had a fiduciary duty to its customers when serving as an underwriter to a stock offering. 5 N.Y.3d at 20. The Court of Appeals found that a fiduciary relationship could be created where the complaint alleges "a relationship of higher trust than would arise from the underwriting agreement alone." Id. It did not, however, suggest, that Goldman Sachs should have treated its customers as a trustee would treat the beneficiary of a

28

trust.  Instead, the court stated that it was recognizing Goldman Sachs' fiduciary duty "to this limited extent — requiring disclosure of Goldman Sachs' compensation arrangements with its customers."  Id. (emphasis added).  It found that the compensation arrangements had to be disclosed because the plaintiff had hired Goldman Sachs specifically to give it advice for its own benefit.  Id.  In other words, the New York Court of Appeals limited the scope of Goldman Sachs' fiduciary duty to the nature of the relationship between Goldman Sachs and the plaintiff.

In this case, there was no trustee/beneficiary, principal/agent or other relationship where one individual placed her affairs or her fortune in the control of another person or entity.  Rather, the relationship in this case will be found to have arisen, if at all, based on the statements made by TIAA regarding the relationship it was creating with its customers inasmuch as it is these statements that underlie plaintiff's contention that a fiduciary relationship existed.  These statements essentially affirm that customers can trust TIAA to provide them with products that best fit their needs and will provide advisory services regarding those products.  Thus the "scope" of the fiduciary relationship – to use the words of the Restatement (Second) of Torts – must be based on the relationship of trust created by those statements.

Accordingly, we reject plaintiff's argument, see, e.g., Pl. Renewed Mem. of Law at 24, that the mere fact that TIAA sold its own products to Dr. Engel constitutes "self-dealing" that renders TIAA liable for breach of fiduciary duty.  See generally Birnbaum, 73 N.Y.2d at 466 (bar against self-dealing arises from fiduciary's "duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect").  Here, there was no actual "self-dealing" as is typically understood by that term – for example, a situation where a trustee acts on both sides of a transaction to sells to himself trust assets belonging to the beneficiary.  TIAA did not control Dr. Engel's assets.  As a seller of insurance products, TIAA cannot be said to have been

29

burdened with the responsibility to act with "undivided" loyalty to Dr. Engel.  Were the rule

otherwise, a stockbroker who had a fiduciary duty with respect to executing trades, see, e.g.,

Bissell, 937 F. Supp. at 246, could be sued for failing to inform a customer that a competitor

charged lower transaction fees.  In the end, the bar against self-dealing cannot possibly have the

application that plaintiff argues: that is, to bar TIAA from engaging in its business with

customers.  It is thus unnecessary to examine whether TIAA would have met the burden of

showing "full disclosure and assent" to justify an improper self-dealing transaction.  Birnbaum,

73 N.Y.2d at 466.

Accordingly, we turn next to the question of whether plaintiff has presented evidence that

would allow a jury to conclude that defendants breached their duty to Dr. Engel in some other

way – or, as New York cases typically put it, whether TIAA committed "misconduct."

Plaintiff does not point to any misrepresentations made by TIAA.  Instead, her argument

essentially is that TIAA committed misconduct when it did not make additional inquiries of Dr.

Engel after she sought the annuity: specifically inquiries into her health and her financial

situation, including for example, her financial needs, her sources of funds, her tax status, and her

risk tolerance.  Pl. Renewed Mem. of Law at 6.  She also faults TIAA for not inquiring whether

Dr. Engel had a lawyer, accountant or other person who could assist her in evaluating and

choosing her investment options for her retirement.  Id.

Plaintiff's argument on this point must be evaluated based on the specific factual record

before this Court and in light of the fact that the plaintiff bears the burden of proving a breach of

fiduciary duty.  See, e.g., Abeles, Inc. v. Creekstone Farms Premium Beef, LLC, 2010 WL

446042, at *4 (E.D.N.Y. Feb. 1, 2010).  We begin by noting that plaintiff has presented no

evidence at all that Dr. Engel either (1) sought advice on what investments to make or (2) was

ever given inaccurate information in response to her inquiries regarding the annuity purchase. Nor does anything in the record show – or allow a justifiable inference – that TIAA actually proposed to plaintiff that she purchase an annuity.

Instead the record shows that plaintiff first raised the issue of the purchase an annuity on August 21, 2000. See Zervakos Conv. This request was repeated in a letter sent the very next day, in which she specifically chooses a "single life annuity without a guaranteed period, standard payment method." See Aug. 22 Letter. Attached was a form in which Dr. Engel chose a "Single life annuity," and which stated in clear terms that "all payments end with your death." See Authorization at 1. Dr. Engel also asked that 100% of her funds be put toward the annuity. Id. at 2.

On August 30, 2000, Dr. Engel contacted defendants to confirm receipt of her letter and authorization form. See Litzau Conv. A counselor, Pat Litzau, confirmed receipt of Dr. Engel's submissions and informed her that defendants were still missing information that was necessary to process her requests. Id.[13] The next day, on August 31, 2000, Dr. Engel spoke with TIAA counselor Heffernan. See Heffernan Conv. After checking the status of Dr. Engel's application, Heffernan called back Dr. Engel, Heffernan told Dr. Engel that "she needed to submit a letter of confirmation to clarify the outstanding items in her application" including whether "she want[ed] to annuitize 100% of TIAA Standard" and "100% of CREF." Id. at DEF00286-87. Heffernan

---

[13]  As noted previously, Litzau asked Dr. Engel whether "she really wanted to use all of her funds in the conversion of a single life annuity knowing all the payments end with her death with no provision for a beneficiary at all." Id. at DEF00283. Litzau also told Dr. Engel that "at her age and [with] the balance involved[,] a full annuity would be against normal logic." Id. However, because Litzau wrote that Dr. Engel "appeared very hard of hearing" and that Litzau was not "sure that [Dr. Engel] really understood what I was asking," id., a jury could reasonably discount the effect this conversation. Accordingly, we do not rely on it for purposes of this decision.

31

confirmed "again" with Dr. Engel that she wanted to annuitize 100% of her funds with no guarantee period and a single life option.  Id. at DEF00287.  In response, Dr. Engel stated to Heffernan that "she was a holocaust survivor and has no family for which she should leave funds."  Id.

The notes indicate that Heffernan explained to Dr. Engel that should she annuitize she would not have a lump sum of cash to access if future expenses should arise.  Id.  Heffernan specifically suggested an alternative that would result in only partially annuitizing Dr. Engel's savings; Dr. Engel said she did not realize this was an option and would think about it.  Id.

Nonetheless, six days later, on September 5, 2000, Dr. Engel wrote a letter to defendants which contained the information that Heffernan had stated was lacking from her forms and which again made absolutely clear that she wanted to annuitize all but $100,000 of her funds. See Sept. 5 Letter.[14]

A report for a call on September 8, 2000, states that Dr. Engel "seemed very confused" during the conversation but there is no indication this conversation was about her choice to purchase an annuity.  See Odumosu Conv.  On September 14, 2000, Dr. Engel complained regarding how long it was taking to get an annuity payment.  See Toxby Conv.

Taken together, these facts would not allow a jury to find misconduct by the defendants in breach of their fiduciary duty.  Instead it shows that Dr. Engel was informed about the important effects of purchasing an annuity with virtually all of her savings – that it would leave no money for heirs and that she would not be able to access the money beyond the periodic payments.  It also shows that Dr. Engel proceeded to implement the annuity transaction.

---

[14] Plaintiff argues that a jury might find that Dr. Engel was "compelled" to write this letter or that it was "extracted" from her by personnel at TIAA.  See Pl. Renewed Mem. of Law at 7.  But this contention is purely speculative and a reasonable jury could not make such an inference from the evidence presented.

32

In its decision on appeal in this case, the Second Circuit made observations regarding the fraud allegations in the complaint regarding TIAA's actions that continue to have applicability even following full discovery:

> Here, it is conceded in the complaint that the defendants informed the decedent that the annuity product she had chosen would cease paying out at her death. In fact, it alleges that decedent herself wrote a letter confirming that this was the annuity option, bearing this characteristic, that she wished to purchase. Any reasonable investor could do the simple multiplication and determine how many payments would be required for her to recover the purchase price of the annuity. Moreover, the only reasonable inference that can be drawn from the complaint is that the decedent knew at least as much about her medical condition as did the defendants' representatives—who are alleged only to have known that she had a weak voice and shaky handwriting. If a reasonable investor knew that she was ill, that a particular annuity would stop paying out at her death, and that she would need to live 12 years to recover the purchase price, the opinion of an employee of the insurance company that this product would not be a good purchase for her would not "significantly alter [ ] the total mix of information made available." Ganino, 228 F.3d at 162 (internal quotation marks omitted).

289 F. App'x. at 464-65. While a different legal issue is being considered now, the same concept applies: the potential effect of poor health on the payouts from an annuity contract is self-evident to the purchaser as long as there is an understanding that all payments from the annuity end with death and that no money is available for an heir or beneficiary. A jury could not reasonably find that TIAA failed to fulfill any duty to make Dr. Engel aware of these two facts.

Nor is there evidence – as opposed to speculation – that would allow a jury to conclude that TIAA used its position of trust to foist an annuity on Dr. Engel. Instead, it reflects that Dr. Engel formed a desire to purchase the annuity and, indeed, expressed frustration that the transaction was not being consummated fast enough. See, e.g., Aug. 22 Letter; Heffernan Conv.; Toxby Conv. Plaintiff argues strenuously that TIAA should have asked Dr. Engel about her health and life expectancy. Pl. Renewed Mem. of Law at 38-39. Defendants argue that there is

no evidence to show "that Dr. Engel had any understanding of her health condition" when she purchased the annuity, Def. Renewed Mem. of Law at 16, a contention plaintiff disputes with citation to medical records, Pl. Renewed Mem. of Law at 10-17, 38-39.  But this Court cannot conclude that, even with the heightened fiduciary duty created by defendants' undertaking to provide appropriate investments and advice as to those investments, a reasonable jury could find that TIAA's failure to make the highly intrusive inquiry into Dr. Engel's health and life expectancy in these circumstances constitutes a breach of that duty or "misconduct."  Dr. Engel had indicated on multiple occasions that she wished to purchase the annuity at issue.  See, e.g., Aug. 22 Letter; Heffernan Conv.  When one of the main features of the annuity she selected – the lack of any payments after death – was pointed out to her, she specifically referred to the fact that she was a holocaust survivor and had no heirs.  See Heffernan Conv.  The mere fact that one letter she wrote states that she was "ill," see Sept. 5 Letter, or that she was perceived on the phone as being "frail," see Toxby Conv., would not permit a jury to conclude that the counselors were under a legal obligation to make inquiries regarding her long-term health and the relationship between her health and the choice to purchase an annuity.

It is true that one of TIAA's employees wrote at about the time the annuity contract was going into effect that "[t]his poor lady could have used some counseling, as she annuitized over $1 million dollars and chose no guaranteed peroid [sic], and she sounds frail."  Id.  But this statement is simply not enough to allow a jury find that TIAA did not meet its obligations as a fiduciary.  It does not constitute proof of any facts regarding statements actually made to Dr. Engel.  Nor could it be binding on the legal question of whether the counseling that previously occurred constituted a breach of fiduciary duty.  See generally Eagleston v. Guido, 41 F.3d 865, 874 (2d Cir. 1994) (statements of party-opponent inadmissible where "they are legal conclusions

concerning an ultimate issue in the case").   Nor does it negate the uncontroverted evidence that counseling in fact took place.

     As noted, plaintiff also faults TIAA for not inquiring into far greater detail into Dr. Engel's financial circumstances and the availability of an independent advisor.  But, once again, we are not faced with a situation where there is evidence that Dr. Engel sought general advice on what to do with her retirement funds.  Instead, the evidence reflects only that Dr. Engel sought to purchase an annuity and was specifically informed of the important consequences of that purchase: that she could not accelerate payments and that there would be no money available after her death.  Indeed, she was reminded of the fact that by choosing to annuitize almost all of her available funds, she would not have funds available if future expenses should arise.  A reasonable jury could not find misconduct simply based on TIAA's failure to make additional inquiries in this situation.[15]

     C.     Unjust Enrichment

     "To prevail on a claim of unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."  In re Mid-Island Hosp., Inc., 276 F.3d at 129 (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)); accord Marcus v. AT&T Corp., 138 F.3d 46, 64 (2d Cir. 1998).  Here, because plaintiff cannot prove misconduct constituting a breach of a

---

[15] Plaintiff also makes arguments about rules of the National Association of Securities Dealers and the New York State Department of Insurance regarding the suitability of securities investments. Pl. Renewed Mem. of Law 21-23, 35.  Putting aside the question of whether the plaintiffs have shown that the annuity in question comes within the definition of a security, the Second Circuit has explained, "there is no right of action simply for a violation of NASD rules," GMS Group, LLC v. Benderson, 326 F.3d 75, 82 (2d Cir. 2003).  In any event, the suitability rules govern instances where a seller has recommended a product.  Finally, plaintiff concedes that she is not suing under either of these rules, see Pl. Renewed Reply at 24, and the rules did not govern the annuity transaction here.

fiduciary duty, she cannot show that "equity and good conscience" require restitution.  To the contrary, the evidence is undisputed that TIAA provided plaintiff with what she bargained for in return for the purchase price of the annuity.  See generally Cornhusker Farms, Inc. v. Hunts Point Coop. Mkt., Inc., 2 A.D.3d 201, 206 (2003) ("the existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment"); accord Beth Isr. Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., 448 F.3d 573, 586-87 (2d Cir. 2006). Moreover, courts have routinely held that a seller of an annuity is not unjustly enriched when an annuitant dies early and thus leaves an unpaid balance.  See Woodworth v. Prudential Ins. Co. of Am., 258 A.D. 103, 107 (1st Dep't 1939); Stockett v. Penn. Mut. Life Ins. Co., 82 R.I. 172, 177 (1954); cf. Rishel v. Pac. Mut. Life Ins. Co. of Cal., 78 F.2d 881, 883 (10th Cir. 1935) (annuitants share risk of outliving their expectancy).  Accordingly, this claim must be dismissed.

      D.    Rescission

      The claim for rescission must be dismissed because, in this instance, it is predicated on the claim of breach of fiduciary duty.  See Am. Compl. ¶¶ 76-77.  Because the breach of fiduciary duty claim fails, the claim for rescission fails as well.  See, e.g., Gall v. Summit, Rovins and Feldesman, 222 A.D.2d 225 (1st Dep't 1995) (dismissing claim for rescission where it was predicated on failed breach of fiduciary duty claim).

IV.    <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment (Docket # 111) is

denied.  Defendants' motion for summary judgment (Docket # 108) is granted.  The Clerk is

requested to enter judgment.

Dated:  August 9, 2012
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

IV.   CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (Docket # 111) is

denied.  Defendants' motion for summary judgment (Docket # 108) is granted.  The Clerk is

requested to enter judgment.

Dated:  August 9, 2012
        New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

37